Kevin Koelbel (SBN 016599)
Erin Rose Ronstadt (SBN 028362)
OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745
(602) 761-4443 Fax
kevin@oberpekas.com
erin@oberpekas.com

*Attorneys for Plaintiff*

# IN THE UNITED STATED DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nikki M. Spaulding, a married woman, | No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Long Term Disability Plan for Employees of Honeywell International Inc.; Christopher Gregg, Vice President, Compensation and Benefits, a plan administrator; Life Insurance Company of North America, a plan fiduciary and Connecticut corporation, | |
| Defendants. | |

For her claims against Defendants Long Term Disability Plan for Employees of Honeywell International Inc. (the "Plan"), Christopher Gregg, the Plan Administrator ("Plan Administrator" or "Mr. Gregg"), and Life Insurance Company of North America ("LINA" or "CIGNA") (collectively, "Defendants"), Plaintiff Nikki M. Spaulding ("Ms. Spaulding") alleges as follows:

## *Jurisdiction, Venue And Parties*

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2. Honeywell International Inc. ("Honeywell") employed Ms. Spaulding.

3. Honeywell provided self-funded short-term disability ("STD") benefits to its employees.

4. Honeywell contracted with LINA to administer STD benefits.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

5.     Honeywell provided STD benefits to its employees, including Ms. Spaulding, as "income protection."

6.     Honeywell adopted the Plan to provide long-term disability ("LTD") benefits to its employees, including Ms. Spaulding.

7.     The Plan is a purported ERISA benefit plan established and maintained by Honeywell for the benefit of its employees.

8.     Ms. Spaulding was a participant and beneficiary of the Plan as a Honeywell employee.

9.     Honeywell is the Plan Sponsor.

10.    Mr. Gregg, Honeywell's Vice President, Compensation and Benefits, is the Plan Administrator.

11.    LINA insures the LTD benefits through Group Policy, No. VDT-980084 (the "Policy").

12.    At the time Ms. Spaulding sought LTD benefits under the Plan, LINA was a third-party administer for the Plan, acted on behalf of the Plan, and acted as an agent of Honeywell or the Plan to make decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

13.    LINA administered claims under the name CIGNA.

14.    LINA is a Plan fiduciary.

15.    Gregg and LINA have a duty to administer the Plan prudently and in the best interest of all Plan participants and beneficiaries.

16.    Mr. Gregg and LINA owe fiduciary duties to Ms. Spaulding.

17.    Ms. Spaulding currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

18.    Mr. Gregg and Honeywell have their principal place of business in the state of New Jersey.

19.    LINA is a licensed insurance company domiciled in the Commonwealth of Pennsylvania and the State of Connecticut and is a wholly owned subsidiary of CG

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

Corporation, a Connecticut holding company.

20.   CG Corporation is in turn a wholly owned subsidiary of CIGNA Holdings, Inc., a Delaware holding company. The parent company of CIGNA Holdings, Inc. is Cigna Corporation, a Delaware holding company.

21.   LINA and Honeywell are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

22.   This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

23.   Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS
### *CIGNA*

24.   CIGNA operates three primary business segments: Global Health Care, Global Supplemental Benefits, and Group Disability and Life.

25.   CIGNA's Group Disability and Life segment provides insurance products and related services for group STD and LTD insurance, group life insurance, and accident and specialty insurance. These products and services are provided by subsidiaries of CIGNA, including LINA.

26.   Within the Group Disability and Life segment, disability products constitute the majority of the segment's business. As of December 31, 2013, there were approximately 13,600 disability policies in force covering approximately 7.5 million claimants.

27.   According to CIGNA's 2013 Annual Report (the "2013 Annual Report"), CIGNA's Group Disability and Life segment received $3.4 billion in premiums and fees. This was a 10% increase from 2012. In 2011 and 2012, CIGNA received $2.8 and $3.1 billion respectively in premiums and fees.

28.   According to CIGNA's 2014 Annual Report (the "2014 Annual Report"), CIGNA's Group Disability and Life segment received $3.6 billion in premiums and fees,

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

which was a 6% increase from 2013.

29.    According to the 2013 Annual Report, CIGNA's adjusted income from operations was $311 million, which was an 11% increase from 2012. In 2011 and 2012, CIGNA's adjusted income from operations was $290 and $281 million respectively.

30.    According to the 2014 Annual Report, CIGNA's adjusted income from operations had increased to $317 million.

31.    According to the 2013 and 2014 Annual Reports, the majority of CIGNA's disability products are offered to employers, including sponsors of ERISA employee benefits plans. CIGNA represents itself as "an industry leader in returning employees to work quickly." As part of its group disability insurance products, CIGNA "provide[s] assistance to employees in returning to work and assistance to their employers in managing the cost of employee disability."

32.    CIGNA integrates its disability insurance products with other disability benefit programs, including social security advocacy. CIGNA markets its integration approach as a way to reduce disability events, improve the return to work rate, and "identify, treat and manage disabilities before they become chronic, longer in duration and more costly."

33.    According to the 2013 and 2014 Annual Reports, "[t]he effectiveness of return to work programs and morbidity levels impact[s] the profitability of disability insurance products."

34.    The majority of products and services provided through CIGNA's Group Disability and Life segment are fully insured, which means that CIGNA assumes the risk for any claims or costs that arise under the issued disability policy.

## *LINA Is A Conflicted Fiduciary*

35.    Pursuant to an agreement between Honeywell and LINA, LINA is required to meet specific "Service Levels." If such Service Levels are not met, Honeywell is entitled to monetary Service Level Credits.

36.    On information and belief, Honeywell monitored LINA's performance by requiring LINA to conduct quarterly meetings and discuss claims analysis, financial

perspectives, and overall Plan performance.

37.   On information and belief, Honeywell conducted random audits on LINA as a way to further monitor its claims handling.

38.   On information and belief, LINA submitted reports of its quarterly meetings to Honeywell.

39.   On information and belief, LINA was financially incentivized to deny disability benefits in light of Honeywell's performance requirements.

40.   LINA is a conflicted fiduciary.

41.   On information and belief, Honeywell knew that LINA had a conflict, and chose LINA to administer both STD and LTD benefits as a means to avoid liability for STD claims and reduce the cost of LTD benefit premiums.

42.   LINA has a demonstrated history of biased and parsimonious claims handling.  In 2013, LINA was the subject of several state insurance investigations by California, Connecticut, Maine, Massachusetts and Pennsylvania (the "Monitoring States").

43.   These investigations revealed systematic irregularities in LINA's claims handling practices related to group LTD insurance policies, and culminated in the May 2013 Regulatory Settlement Agreement (the "RSA").

44.   LINA and other CIGNA companies became the subject of and signatories to the RSA.

45.   LINA was assessed with monetary penalties, was forced to reopen several years' worth of denied claims under a remediation program, and was required to set aside $77 million for projected payments to claimants whose claims were improperly denied or terminated.

46.   Based on its prior conduct, LINA was also required to make specified changes to its claims reviewing procedures (the "Enhanced Claims Procedures").

47.   The Enhanced Claims Procedures mandate certain standards for evaluating claims, including the appropriate use of external medical resources.

48.   LINA failed to follow the Enhanced Claims Procedures outlined under the RSA.

*Plan Language*

49. Under the terms of the Plan, to be considered Disabled, Ms. Spaulding must:

➢ Have a covered Sickness or Injury;

➢ Be receiving Appropriate Care and Treatment from a Doctor on a continuing basis for such Sickness or Injury;

➢ Be unable to perform all the material duties of [her] Own Occupation;

➢ Be unable to earn 80% or more of [her] indexed Base Monthly Pay at [her] Own Occupation for any employer in the Local Economy.

50. After receiving LTD benefits for 24 months under the Plan, Ms. Spaulding will be considered Disabled if, "solely because of Sickness or Injury, [she is] either (1) unable to perform all the duties of ANY occupation for which [she is] or may reasonably become qualified, based on education, training, or experience' or (2) unable to earn 80% or more of [her] Indexed Base Monthly Pay at any gainful occupation for any employer in [her] Local Economy."

51. The Plan defines "Sickness" as "any physical or mental illness."

52. The Plan defines "Local Economy" as "the geographic area within which You reside and which offers suitable employment opportunities within a reasonable travel distance. If you move on or after the date You become Disabled, Local Economy means the geographic area within which You formerly resided and currently reside and which offers suitable employment opportunities within a reasonable travel distance."

53. The Plan defines "Own Occupation" as:

the occupation you routinely performed at the time your Disability began. In evaluating Disability, Cigna will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. However, if prior to the onset of your Disability your work was modified in accordance with a reasonable accommodation (as required or permitted by the Americans with Disabilities Act, or any similar state or local law regarding disability discrimination), your "Regular Occupation" will be the occupation you routinely performed at the time your Disability began as modified by such reasonable accommodation if such reasonable accommodation commenced at least six months prior to the Elimination Period. Likewise, if prior to the onset of your Disability your work was modified in accordance with a reasonable accommodation (as required or permitted by the Americans with Disabilities Act, or any similar state or local law regarding disability discrimination), your "Regular Occupation" will be the occupation your routinely performed at the time your Disability began without regard to such reasonable accommodation if such reasonable accommodation commenced less than six

-6-

months prior to the Elimination Period.

54.   To obtain Benefits under the Plan, Ms. Spaulding must submit Proof of her Disability.

55.   The Plan defines "Proof" as "written evidence satisfactory to Cigna that You have satisfied the condition and requirements for any Plan benefit. To be satisfactory, the written evidence must establish (1) the nature and extent of the loss or condition, (2) Cigna's obligation to pay the Plan benefit, and (3) Your right to receive the Plan benefit."

### Ms. Spaulding's Employment

56.   Ms. Spaulding began working for Honeywell in 1999 as an Administrative Assistant.

57.   In 2011, Honeywell promoted Ms. Spaulding to Executive Assistant.

58.   As an Executive Assistant, Ms. Spaulding was responsible for four IT Directors and their teams for the Honeywell Aerospace Information Technology group.

59.   Based on Honeywell's job description, the Material Duties of Ms. Spaulding's Regular Occupation include travel arrangements, calendar management, processing requests for payment of monthly and one-time costs, and other ad hoc projects as required.

60.   Honeywell's required "temperaments and aptitudes" for the job are:

➢   Accepting responsibility for control, direction, or planning of an activity;

➢   Performing a variety of duties, often from one task to another without loss of efficiency or composure;

➢   Perform under stress when confronted with emergencies or unusual situations;

➢   Dealing with people beyond giving and receiving instruction such as working as a member of a team or committee; and

➢   Make generalizations, judgments, or decisions based on subjective or objective criteria such as with the five senses or factual data.

61.   Ms. Spaulding's position as an Executive Assistant was sedentary, requiring continuous sitting (5.5 or more hours) and occasional walking (less than 2.5 hours).

62.   Ms. Spaulding worked in the position of Executive Assistant until she ceased working on May 15, 2015 due to her disabling conditions.

-7-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

*Ms. Spaulding's Disability Claim*

63.    Ms. Spaulding initially began feeling ill after a trip to Tanzania, Africa in April 2014.

64.    Ms. Spaulding applied for and received STD benefits from May 2014 to September 2014.

65.    After returning to work, Ms. Spaulding continued to struggle with disabling conditions, and her health declined.

66.    Ms. Spaulding again applied for STD benefits on May 20, 2015.

67.    In a July 16, 2015 letter, LINA wrongfully denied Ms. Spaulding's STD benefits.

68.    On July 26, 2015, as required under the STD Plan, Ms. Spaulding appealed LINA's decision.

69.    In an August 24, 2015 letter, LINA upheld its decision to deny STD benefits.

70.    Despite the denial of STD benefits, Ms. Spaulding remained Totally Disabled under the STD Plan.

71.    On December 23, 2015 Ms. Spaulding applied for LTD benefits.

72.    The Elimination Period for LTD benefits coincides with the STD benefit period.

73.    To qualify for LTD benefits, an Eligible Employee "must be continuously Disabled for the 26 week Elimination Period."

74.    If claimant seeking LTD benefits does not remain disabled through the Elimination Period, they cannot obtain LTD benefits.

75.    Because LINA denied STD benefits, Ms. Spaulding would not satisfy the condition of being Disabled for the Elimination Period and LINA would avoid liability for LTD benefits.

76.    LINA had an incentive to deny STD benefits.

77.    LINA intentionally, willfully, and unreasonably denied Ms. Spaulding's STD benefits to avoid liability for LTD benefits.

78.    Despite not having obtained all medical records, in a March 31, 2016 letter, LINA denied Ms. Spaulding's LTD claim (the "LTD Denial").

-8-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

79.     The rationale for the LTD Denial was that LINA "[had] not received any ***current physical measurable clinical exam findings which quantify a physical functional impairment*** other than not working in unprotected heights, climbing ladders, driving a vehicle until cleared by neurology or operating dangerous equipment, and you should avoid work environments with high humidity, strong chemical fumes, high dust or high particulate smoke." (emphasis added.)

80.     The Plan, however, does not require "measurable clinical exam findings" or a "quantif[ication of] a physical functional impairment," to qualify for LTD benefits.

81.     LINA engrafted this requirement into the Policy and then relied upon it to deny Ms. Spaulding's LTD benefits.

82.     Adding this additional language to the Policy defeated Ms. Spaulding's reasonable expectation of coverage.

83.     A "policy may not be interpreted so as to defeat the reasonable expectations of the insured." *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 389-90, 682 P.2d 388, 394-95 (1984).

84.     "[P]rotecting the reasonable expectations of insured, appropriately serves the federal policies underlying ERISA." *Saltarelli v. Bob Baker Grp. Med. Trust,* 35 F.3d 382, 386 (9th Cir. 1994) (citing 29 U.S.C. § 1001).

85.     The reasonable-expectations doctrine has "widespread acceptance and vitality." *Id.* (citing Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes,* § 1.03[b][2] (6th ed. 1993)).

86.     If an insurer wishes to limit its liability, it must employ language in the policy that clearly and distinctly communicates to the insured the nature of the limitation. *Roberts v. State Farm Fire and Casualty Co.*, 146 Ariz. 284, 286, 705 P.2d 1335, 1337 (1985).

87.     LINA's reliance on an improper and non-existent definition deprived Ms. Spaulding of a full and fair review.

88.     On April 25, 2016, Ms. Spaulding requested from LINA copies of all relevant documents as that terms is defined in 29 C.F.R. § 2560.503-1(m)(8).

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

89. The definition of "relevant" document in 29 C.F.R. § 2560.503-1(m)(8) includes but is not limited to:

➢ any document "submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination"

➢ any document that "constitutes a statement of policy or guidance with respect to the plan concerning the denied benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination."

90. On May 10, 2016, Ms. Spaulding filed a lawsuit in Arizona State Court (Maricopa Count Superior Court Cause No. CV2016-006516) seeking her STD benefits (the "STD Lawsuit").

91. On May 13, 2016, LINA responded to Ms. Spaulding's request for relevant documents and explicitly declined to produce:

➢ "All service contracts for third-party vendors or entities that consulted on Ms. Spaulding's claim or that Cigna communicated with regarding Ms. Spaulding's claim" because LINA deemed it "not relevant."

➢ "All Documents that involve compliance with any administrative processes and safeguards designed to ensure and to verify that claim determinations are made in accordance with governing Plan documents, and that the Plan provisions have been applied consistently with respect to similarly-situated claimants" because LINA claimed, despite the definition of "relevant" in 29 C.F.R. §2560.503-1(m)(8), Ms. Spaulding is only entitled to documents that were relied on, submitted, considered, or generated for her claim.

➢ "All plans, policies, guidelines, and training manuals used to guide CIGNA's representatives in evaluating claims" because LINA claimed, despite the definition of "relevant" in 29 C.F.R. §2560.503-1(m)(8), Ms. Spaulding is only entitled to documents that were relied on, submitted, considered, or generated for her claim.

➢ "The policies and procedures used by CIGNA to assess Ms. Spaulding's disabling conditions, including but not limited to, gastrointestinal issues, pain, fatigue, fever, and Chikungunya virus" because LINA claimed, despite the definition of "relevant" in 29 C.F.R. §2560.503-1(m)(8), Ms. Spaulding is only entitled to documents that were relied on, submitted, considered, or generated for her claim.

➢ "All policies and procedures that are designed to mitigate the structural conflict of interest in deciding which participants are eligible for benefits and the financial interest of CIGNA as payor of those benefits" because LINA claimed, despite the definition of "relevant" in 29 C.F.R. §2560.503-1(m)(8), Ms. Spaulding is only entitled to documents that were relied on, submitted, considered, or generated for her claim.

92. LINA's denial of access to all relevant documents denied Ms. Spaulding a full and

-10-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

fair review.

93.    On July 14, 2016, Honeywell, with LINA's consent, removed the STD Lawsuit to Federal District Court claiming diversity jurisdiction.

94.    On information and belief, this was done to delay resolution of the STD Lawsuit, thereby wearing Ms. Spaulding down emotionally and financially, and to increase the demand on her attorneys' time as part of a larger business strategy to discourage attorney representation by making these types of claims economically impractical, thus increasing the likelihood that denials of STD benefits will be affirmed closing the door to LTD benefits.

95.    On September 27, 2016, Ms. Spaulding appealed LINA's LTD Denial (the "LTD Appeal").

96.    LINA's deadline to make a decision on the LTD Appeal was November 11, 2016.

97.    On October 7, 2016, LINA informed Ms. Spaulding that it required additional information and was tolling the time to decide the LTD Appeal until it received the information.

98.    On October 14, 2016, Ms. Spaulding provided the requested information.

99.    To the extent that LINA had a right to toll the time to decide the LTD Appeal, at best, the time tolled for one week and LINA's deadline to decide the LTD Appeal was November 18, 2016.

100.   On November 2, 2016, LINA notified Ms. Spaulding that it was still considering the LTD Appeal.

101.   LINA did not make a decision on the LTD Appeal by November 18, 2016 and did not request additional time to make a decision.

102.   On November 23, 2016, the District Court remanded the STD Lawsuit to State Court, finding that Honeywell could not prove the necessary amount in controversy.

103.   At the time of the filing of this Complaint, the STD Lawsuit remains pending in State Court.

104.   The parties tried to reach a settlement on the STD Lawsuit, but never had a meeting of the minds because LINA tried to use the settlement of the STD Lawsuit to limit

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

Ms. Spaulding's claims and relief sought in this case, which further evidences LINA's conflict of interest.

105.  Ms. Spaulding is informed and believes that LINA was monitoring the STD Lawsuit through legal counsel, waiting to make a determination on the LTD claim until knowing the outcome of the STD Lawsuit.

## Ms. Spaulding's Disability

106.  Ms. Spaulding suffers from severe pain that interferes with her ability to carry out her activities of daily living, as well as her ability to perform her Regular Occupation.

107.  Ms. Spaulding's pain is multifactorial – stemming from Fibromyalgia, Complex Regional Pain Syndrome ("CRPS"), Degenerative Disc Disease ("DDD"), and possibly post-viral pain from an undetermined infectious disease.

108.  There is no objective testing for pain, but Ms. Spaulding's treating providers have observed and documented several physical examination findings substantiating Ms. Spaulding's pain complaints, including:

 ➢ Pain with spurling maneuver

 ➢ Antalgic gait

 ➢ Tenderness to palpation

 ➢ Diffuse allodynia, dysesthesias in bilateral lower extremities

 ➢ Diffuse myalgias and arthralgias

109.  Objectively, Ms. Spaulding's DDD is documented in diagnostic imaging.

110.  An April 27, 2016 lumbar spine MRI revealed multi-level DDD, most significant at the L4-5 level, which shows a right central disc protrusion with an annular fissure, facet arthropathy with a left facet joint effusion, ligamentum flavum thickening resulting in moderate spinal stenosis, bilateral lateral recess stenosis, bilateral neural foraminal stenosis, and a congenitally narrow spinal canal.

111.  An April 27, 2015 thoracic spine MRI revealed multilevel DDD with facet arthropathy and neural foraminal stenosis at levels C7-T1, T1-2, T2-3 and T4-5.

112.  On May 13, 2015, Dr. Ramin Sabahi, a rheumatologist, evaluated Ms. Spaulding for

-12-

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

her ongoing complaints of severe pain in her fingers, wrist, elbows, shoulders, knees, ankles, and lower back, as well as intermittent fevers and fatigue.

113. Laboratory testing from May 14, 2015 revealed an elevated C-Reactive Protein ("CPR") of 25.8 mg/L, indicating inflammation in the body.

114. Dr. Sabahi's physical examination revealed soft tissue tenderness of the upper back, lower back, lateral hips, knees, and elbows.

115. Based on these objective clinical findings, Dr. Sabahi diagnosed Ms. Spaulding with Fibromyalgia.

116. Ms. Spaulding's pain has been treated with various medications, including opioid pain medications, physical therapy, and a spinal cord stimulator trial.

117. Initially, Ms. Spaulding's primary care providers ("PCPs") at IM Specialists, Inc. maintained her opioid medication regimen.

118. Ms. Spaulding advised LINA of her new pain management doctor, Dr. Burgher, on March 4, 2016.

119. Ms. Spaulding's first office visit with Dr. Burgher was on March 21, 2016.

120. LINA purportedly requested these medical records on March 23, 2016, allowing Dr. Burgher's office less than a week to provide the records, which was unrealistic.

121. Demanding production of medical records necessary to a full and fair review on a week's notice and then rendering a decision without the necessary records deprived Ms. Spaulding of a full and fair review.

122. LINA sent Ms. Spaulding's file for an Occupational Analysis without Dr. Burgher's medical records and ultimately denied the claim without obtaining or considering these records.

123. To manage her pain, Ms. Spaulding is currently taking prescribed medications and receiving injections through her current PCP, Fizzah Sheikh, PA-C.

124. On July 14, 2016, Ms. Spaulding had a temporary trial spinal stimulator implanted at her T12-L1 levels.

125. After a week trial, Ms. Spaulding reported approximately 60% improvement in her

symptoms with the spinal cord stimulator.

126.  She plans to move forward with a permanent implantation of the spinal cord stimulator in her cervical and lumbar spine with whoever her new provider will be.

127.  Despite the trial for the spinal cord stimulator, Ms. Spaulding remains in debilitating pain.

### *Neurological Abnormalities*

128.  Ms. Spaulding has a history of myoclonic jerking events and generalized tonic-clonic seizure activity since approximately June 2014.

129.  Ms. Spaulding primarily has nocturnal seizures associated with tongue biting, loss of urine, and confusion.

130.  She takes prescription medication for seizure control; however, she continues to have breakthrough seizures.

131.  On September 10, 2015, an electroencephalogram ("EEG") study demonstrated multiple phase reversals in the frontal regions.

132.  On January 18, 2016, a 24-hour EEG revealed the presence of bursts of generalized slowing, as well as bursts of left hemispheric slowing.

133.  The left hemisphere slowing could have been from her initial viral infection.

134.  If an EEG test is normal (or abnormal, but not necessarily indicative of a seizure), it only means that there is no epileptic activity in the brain at the time the test is being done.

135.  The EEG did not rule out epileptic activity or seizures.

136.  Ms. Spaulding also experiences severe migraine headaches and sleep apnea.

137.  She has taken multiple variations of medication for her migraines.

138.  Currently, Ms. Spaulding takes prescribed medications for migraine control and breakthrough pain, but she continues to have occasional breakthrough migraines.

139.  Ms. Spaulding also has chronic fatigue and excessive daytime sleepiness.

140.  On October 5, 2015, Ms. Spaulding underwent a sleep study revealing mild-to-moderate Obstructive Sleep Apnea Syndrome.

141.  Dr. Klaski concluded that the deoxygenation of the brain from the sleep apnea and

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-14-

opioid pain medications may be contributing to her seizures.

142.  Ms. Spaulding utilizes a CPAP for her sleep apnea. It does not resolve her symptoms.

143.  Her neurologic workup is ongoing to pinpoint the cause of her verified conditions.

*Gastrointestinal Issues*

144.   Ms. Spaulding has a history of colitis that resulted in a hospitalization in May 2014.

145.  A CT scan done at that time revealed circumferential wall thickening of left colon and peri-colonic inflammatory changes consistent with colitis.

146.  A colonoscopy done on March 2, 2015 revealed diverticulosis of the descending colon and internal hemorrhoids.

147.  She suffers from severe constipation from her use of opioid pain medications.

148.  She utilizes lactulose in an effort to maintain regular bowel movements. She also has intermittent lower abdominal pain and cramping, bloating, and a loss of appetite.

*Psychiatric and Cognitive Issues*

149.  Ms. Spaulding's psychiatric condition has been severely exacerbated by her medical conditions.

150.  On May 19, 2015, Ms. Spaulding reported to her PCP that she was "unable to work due to excessive pain from sitting for prolonged periods of time, body aches, severe fatigue, anxiety, and demoralization. She is unable to focus well while being on opioid therapy."

151.  Her PCP started her on Cymbalta for anxiety and pain reduction.

152.  On June 22, 2015, David Bone, PA-C completed an assessment form, noting that Ms. Spaulding suffered from Major Depressive Disorder with a Global Assessment of Functioning ("GAF") score of 51.

153.  In his mental status exam, Mr. Bone noted a depressed mood and flat affect.

154.  Mr. Bone explains that Ms. Spaulding "experiences anxiety attacks when she tries to do more than she is physically able to [do], causing her to feel very overwhelmed."

155.  During multiple office visits it was noted that Ms. Spaulding was "not doing well"

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

emotionally, would cry often, was not sleeping well, was "feeling demoralized by her non-working status," and was having feelings of worthlessness and guilt.

156. She reports multiple stressors that contribute to her psychiatric condition, including her medical conditions and an inability to work.

157. In September 2015, Ms. Spaulding's neurologist discontinued her Cymbalta due to its possible contribution to her seizure activity.

158. Unfortunately, this resulted in Ms. Spaulding going several months without psychiatric medications due to possible interactions with her other medications and her propensity for seizures; the inability to take Cymbalta caused further deterioration to Ms. Spaulding's mental health.

159. Ultimately, Ms. Spaulding's PCP referred her for proper psychiatric treatment and she is receiving counseling.

160. Currently, Ms. Spaulding's PCP maintains her psychiatric medication regimen. She has been diagnosed with Major Depressive Disorder, and she is currently treated and prescribed medication.

### Ms. Spaulding's Restrictions and Limitations

161. LINA has failed to consider Ms. Spaulding's restrictions and limitations.

162. On March 29, 2016, Lisa Rossetti, MS, LPC, CRC, on behalf of LINA, conducted an Occupational Analysis.

163. Ms. Rossetti's analysis only considered the limitations outlined by Dr. Minteer and thus found that Ms. Spaulding could perform her Own Occupation.

164. Ms. Rossetti's "analysis" was one sided. It did not consider Ms. Spaulding's symptomology, the medical records, or the restrictions and limitations outlined by her treating providers. For these reasons, Ms. Rossetti's Occupational Analysis should be disregarded.

165. Ms. Spaulding is unable to perform her Own Occupation. She continues to have persistent symptoms as a result of her conditions, and she is still undergoing extensive evaluation and treatment.

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-16-

166. Ms. Spaulding has reported multiple restrictions and limitations that would preclude her from any work activity. Ms. Spaulding's complaints are valid, reliable, and LINA should have considered them.

167. Ms. Spaulding's treating providers support her inability to work:

➢ In a letter dated May 19, 2015, David Bone, PA-C wrote,

> I am writing on behalf of Mrs. Nikki Spaulding, who has been a patient of ours for several years. As you may or may not know, Mrs. Spaulding has been suffering from a chronic painful condition stemming from an illness she contracted while visiting the African continent in April 2014. Her condition renders her unable to function at work due to body aches which are greatly exacerbated by prolonged sitting at her computer. Continuing to work through the pain has caused her great emotional stress, as well. She continues to see myself, as well as two other specialists in order to get a better handle of Nikki's medical condition. Meanwhile, Nikki has requested to be placed on short-term disability which I fully support.

➢ On June 16, 2015, David Bone, PA-C completed a *Medical Request Form* noting that Ms. Spaulding is "unable to function due to body aches which are greatly exacerbated by prolonged sitting," and she is "unable to sit for more than 10-15 minutes continuously."

➢ On June 22, 2015, David Bone, PA-C completed another assessment form noting that Ms. Spaulding could <u>not</u> perform the following work temperaments/duties:

1. Performing repetitive work;
2. Performing a variety of duties;
3. Performing under stress; and
4. Attaining precise limits/tolerances.

Mr. Bone also noted that Ms. Spaulding suffered from "some cognitive impairment/loss of concentration, memory, and attention due to her current opioid therapy."

➢ On July 15, 2015, David Bone, PA-C wrote that, "[u]nfortunately, Nikki's condition has not improved as we have hoped. She feels that she is still unable to return to work at the goal date of July 20, 2015. . . .I will be happy to complete the necessary paperwork in order to get this disability approved for her."

➢ On July 28, 2015, David Bone, PA-C noted that, "[Ms. Spaulding] is not able to sit for prolonged periods of time due to stiffness, burning sensation in her joints. . . She cannot go longer than 15-20 minutes without changing positions, depending on when she took her last dose of the Oxycodone. The stamina in her hand and feet joints are diminished as she cannot grasp for more than a few minutes without feeling weakness in her hands." Mr. Bone assessed that her condition continues to render her unable to function at work.

➢ On August 17, 2015, David Bone, PA-C noted that Ms. Spaulding is "unable [sic] to function at work due to her wide-spread and often debilitating muscle and joint

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-17-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

pains."

➤ On February 17, 2016, Jeffery Mikesell, PA-C completed a *Physician's Statement of Disability* form noting limitations inconsistent with work activity.

➤ In a letter faxed to Cigna on March 22, 2016, Fizzah Sheikh, PA-C wrote,

Nikki Spaulding is a 42 y.o. Female who is believed to have contracted Chikungunya disease during a trip to Africa, she is currently being evaluation by the CDC for further work up and evaluation. Due to this condition she does have severe pain and admits that she cannot stay seated or standing for prolonged periods of time. She also has loose stools, abdominal cramps, muscle aches, and a seizure disorder, which is not well controlled yet. She has been an inpatient @ Banner Desert for 8 days previously.

Although she is seated comfortably and is cognitively intact during her last few office visits. Her seizures and severe joint pain are still deterrents preventing her from her working at this time. She does have difficulty staying focused and recalling some details of her illness, per her visit with me on 2/26/16. She is pursuing further evaluation and treatment by the CDC. Please maintain her disability at this time as she is not able to work until her condition is stabilized.

168. Ms. Spaulding's multiple medical conditions require her to take several different medications. Cigna failed to consider the impact these medications have on Ms. Spaulding's ability to work. She has experienced and continues to experience side effects from various medications.

169. Ms. Spaulding's September 27, 2016 Declaration states:

Currently, I take several medications. I take the following prescription and OTC medications: Lactulose 10 gm/15 – 30 ml at night for constipation; Oxtellar XR 600 mg, 2 tablets once a day for seizures; Amitriptyline HCL 25 mg, 1 tablet at night for depression and sleep; Levetiracetam (Keppra) 1000 mg, 1 tablet twice a day for seizures; Oxycodone 15 mg, 1 tablet every 6 hours for pain; Fentanyl Transdermal patch, 25 mcg/hr, 1 patch every 72 hours for pain; Enalapril 20 mg, 1 tablet twice a day for blood pressure; Triamterene/Hydrochlorothiazide 37.5-25 mg, one pill once a day for blood pressure; Gildess 1/20, 1 pill once a day for Endometriosis; and Sumatriptan Succinate 100 mg as needed for migraines. The OTC medications I take daily include Women's vitamins, Fiber + Calcium vitamins, Valerian, Fish Oil, Stress B-Complex vitamin, Potassium Gluconate, Aspirin 81 mg, Magnesium Oxide, DoTerra TriEase Seasonal Blend; and ItWorks Confianza. Although the medications help, they only provide minimal or temporary relief. They do not completely alleviate my pain, anxiety, depression or insomnia. Additionally, I have a lot of side effects from them, often requiring additional medications. The Oxycodone and Fentanyl side effects for me are nausea, constipation, loss of appetite, sweating, fatigue, dizziness, inability to concentrate, feeling cold and weakness. Side effects for the Amitriptyline include drowsiness and blurred vision. The Oxtellar XR will give me shakiness and indigestion. My side effects from Keppra include agitation, fatigue, anxiety, mood swings, and inability to concentrate. The Lactulose was prescribed to me to help with the constipation caused by the Oxycodone and MS Contin (no longer taking, replaced by Fentanyl). This medication also gives nausea, diarrhea and gas as side effects.

170.  The unintended side effects from her medications are sufficiently disabling in and of themselves, but LINA ignored that Ms. Spaulding's medications and medical conditions interfere with her ability to work and be a reliable employee.

## *LINA's Denial*

171.  LINA improperly relied on the opinion of its medical file reviewers to support its Denial.

172.  The opinions of Amy Herbster, RN, Dr. W. Minteer, Jr., and Kristin Johnson, LPC, BHS were against the clear weight of the medical evidence, which is reflected in their respective reports. For example, in Ms. Herbster's March 16, 2016 report, she disagreed with the findings of Jeffrey Mikesell PA-C's restrictions and limitations, in part, because there were no documented physical or cognitive deficits and no EEG results on file. However, there was EEG results and physical examination findings on file.

173.  In Dr. Minteer's March 17, 2016 report, he notes that there is "no obvious, significant direct impact on functional status" due to Ms. Spaulding's pain symptomology. This is clearly against the weight of the medical evidence. The primary reason Ms. Spaulding cannot work is due to her pain. Dr. Minteer only notes "minimal direct impact on functional status" due to Ms. Spaulding's seizure disorder with no specific restrictions or limitations. This is unreasonable. Ms. Spaulding's seizure disorder results in several safety hazards, including her inability to drive. Further, Dr. Minteer does not consider Ms. Spaulding's multiple conditions that would contribute to her severe fatigue, including sleep apnea, allergies/asthma, seizures, and Fibromyalgia.

174.  Dr. Minteer disregards Mr. Mikesell's February 17, 2016 restrictions and limitations, in part, because it is purportedly "not well supported by medically acceptable clinical or laboratory diagnostic techniques."  This, however, is not a requirement of the Plan.

175.  Dr. Minteer does not consider Ms. Spaulding's other treating provider assessments in conjunction with Mr. Mikesell's assessment. One reason Dr. Minteer cited for his opinion is "a copy of the recent video EEG study has not been made available for our review."

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ  85012
(602) 277-1745

Even if true, it was LINA's obligation to obtain the study, which it failed to do because it did not provide the medical facility that performed the study with a HIPAA compliant authorization. But, in fact, the findings from the video EEG study were included in Dr. Klaski's medical records and available for Dr. Minteer's review at the time of his report.

176.  In the conclusion to his March 17, 2016 report, Dr. Minteer suggests the following restrictions and limitations:

> [Ms. Spaulding] would be limited to frequent sitting, standing, walking, reaching in any direction, simple, fine, and firm grasping and occasional lifting and carrying up to 20 pounds. She should not work in unprotected heights, climb ladders, drive a vehicle until cleared by neurology or operate dangerous equipment. She should avoid work environments with high humidity, strong chemical fumes, high dust or high particulate smoke.

177.  On March 23, 2016, Dr. Minteer issued an addendum report after reviewing a March 1, 2016 office visit note from Dr. Klaski.

178.  Dr. Klaski's March 1, 2016 office visit note assesses Ms. Spaulding with epileptic syndrome, chronic migraines, and obstructive sleep apnea, prescribes medication for seizures and pain, and refers her for pain management and neuropsych testing.

179.  Despite this additional information, Dr. Minteer concluded that the information "provides no new insight which would change my written opinion of 3/17/16."

180.  Fizzah Sheikh, PA-C's March 22, 2016 letter supporting ongoing Disability was purportedly forwarded to Dr. Minteer for review; however, it was not addressed or considered in Dr. Minteer's addendum. Of significance, Dr. Minteer specializes in family, sports, occupational, and physical medicine. He is not properly situated to opine on Ms. Spaulding's conditions, which are primarily rheumatological, neurological, and internal medicine related. Dr. Minteer appropriately declined to opine on Ms. Spaulding's psychiatric conditions.

181.  On March 21, 2016, Ms. Johnson conducted a psychiatric assessment of the file and opined that the "[c]urrent medical information on file does not demonstrate a psychiatric functional impairment as evidenced by no current psychiatric diagnosis, no current psychiatric restrictions, most recent [office visit note] on file indicates that there is

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-20-

no anxiety or depression noted. Psychiatric symptoms are not sufficient to restrict work."

182.   Apparently, Ms. Johnson did not review all of the available information on file, because as of the most recent office visit note made available for Ms. Johnson's review at the time of her report (office visit note dated February 17, 2016), Mr. Mikesell recommended Ms. Spaulding undergo psychiatric assessment. He notes that, "she would benefit from expert analysis regarding the many different symptoms she currently has, the intensity and duration of her condition and potential for resulting mood changes." During her January 4, 2016 appointment with Mr. Mikesell, she reported that she was "miserable" and "hate[s] [her] life." Mr. Mikesell notes a diagnosis of "MDD" (Major Depressive Disorder). As noted *supra*, Ms. Spaulding has presented with psychiatric complaints on many occasions. She has been noted to be tearful during many of her office visits. LINA's complete disregard for Ms. Spaulding's psychiatric condition is further evidence of its poor review.

183.   Dr. Minteer, Ms. Herbster, and Ms. Johnson's opinions are not credible and should not be considered over the weight of Ms. Spaulding's treating providers. Furthermore, they have provided their opinions without personally examining Ms. Spaulding and without consulting with her treating providers. Cigna should have disregarded Dr. Minteer's, Ms. Herbster's, and Ms. Johnson's opinions.

184.   Ignoring treating physician opinions without explanation denied Ms. Spaulding a full and fair opportunity to perfect her claim for LTD benefits.

185.   Based on the collective medical evidence, Ms. Spaulding cannot perform the material duties of her Own Occupation and therefore comes within the definition of Disability under the Plan.

186.   LINA failed to properly consider Ms. Spaulding's documented symptomology and credible complaints.

187.   LINA did not properly consider the opinions of Ms. Spaulding's treating providers, instead relying on its own file reviewers. Cigna demonstrated bias in its review, which is not indicative of a full and fair review.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

188. LINA failed to consider the medical evidence under the proper terms of the Plan.

189. As mentioned *supra*, contrary to the Denial, the Plan does not require "measurable clinical exam findings" or a "quantif[ication of] a physical functional impairment." This language was not incorporated into the Policy definition of "disability," nor was the fact that it would be used in the review process disclosed to Ms. Spaulding until after her LTD benefits were denied.

190. Looking at only objective evidence to the exclusion of observed findings and a claimant's symptoms is both unfair and unreasonable. *See Mitchell v. Eastman Kodak, Co.*, 113 F.3d a433, 442-43 (1997) *abrogated on other grounds by Metropolitan Life Ins. Co. v. Glenn,* 544 U.S. 105 (2008) (holding that a strict requirement of objective medical showing of disability constituted an abuse of discretion).

191. Ms. Spaulding cannot perform the material duties of her Own Occupation or Any Occupation and therefore comes within the definition of Disability under the Plan.

### COUNT I
### (Recovery of LTD Plan Benefits)
### (Defendants LINA and the Plan)

192. All other paragraphs are incorporated by reference.

193. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

194. The Plan represents LTD coverage and a promise to provide LTD benefits until Ms. Spaulding is no longer Disabled under the terms of the Plan.

195. Ms. Spaulding continues to be Disabled from her Own Occupation and Any Occupation.

196. Ms. Spaulding has claimed the benefits under the Plan to which he is entitled.

197. Ms. Spaulding reasonably expected that her medical conditions met the requirements of Disability as defined by the Plan and that she would receive benefits under the Plan until she reaches her Social Security Normal Retirement Age or until she was no longer disabled.

198. Despite the coverage of Ms. Spaulding's Disability, LINA and the Plan improperly

1    denied her LTD benefits in breach of the Plan and ERISA.

2        199.   LINA's and the Plan's collective conduct was arbitrary, capricious, an abuse of

3    discretion, not supported by substantial evidence, and clearly erroneous.

4        200.   Although the Summary Plan Description purports that Mr. Gregg delegated

5    discretionary authority to LINA, because LINA and Mr. Gregg failed to exercise any

6    discretion by failing to make a decision on the LTD Appeal, she is deemed to have

7    exhausted her administrative remedies and review of her claim is *de novo. See* 29 C.F.R. §

8    2560.503-1(l); *see also Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan,* 349

9    F.3d 1098, 1107 (9th Cir. 2003) ("[T]o be entitled to deferential review, not only must the

10   administrator be given discretion by the plan, but the administrator's decision in a given

11   case must be a valid exercise of that discretion.") (quoting *Gilbertson,* 328 F.3d at 633) ; *id.*

12   ("[T]here is an undeniable logic in the view that a plan administrator should forfeit

13   deferential review by failing to exercise its discretion in a timely manner.") (quoting

14   *University Hosps.,* 202 F.3d at 846 n.3).

15       201.   Instead of evaluating a participant's eligibility based on the applicable plan language

16   and medical evidence, Ms. Spaulding is informed and believes that LINA makes claims

17   decisions based on the claims resources and financial risk it faces on certain claims.

18       202.   LINA wrongfully denied Ms. Spaulding's LTD benefits without providing a

19   coherent explanation for its denials, and in a way that conflicts with the plain language of

20   the Plan, violating 29 U.S.C. §§ 1109, 1132.

21       203.   LINA did not properly consider all of the available evidence when denying Ms.

22   Spaulding's LTD benefits.

23       204.   LINA misstated medical evidence for its own financial benefit, *e.g.,* it excessively

24   relied on biased medical reviews provided by in-house medical consultants.

25       205.   LINA relied on findings that constitute "clearly erroneous findings of fact" to deny

26   Ms. Spaulding's LTD benefits.

27       206.   Upon information and belief, LINA tainted its medical file reviewers by giving the

28   reviewers inaccurate information regarding Ms. Spaulding, while also failing to provide its

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-23-

reviewers with all of the relevant evidence.

207. Upon information and belief, LINA provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

208. LINA routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

209. LINA and Mr. Gregg unreasonably withheld relevant documents throughout the entire claim and poorly managed the file, which is evidenced, in part, by its repeated failure to provide all relevant documents.

210. LINA's and Mr. Gregg's failure to comply with ERISA's disclosure requirements and poor management of the file demonstrates its abuse of discretion and improper claims handling.

211. None of LINA's reviewing physicians ever set forth any substantive reasons why Ms. Spaulding's treating doctors' opinions were incorrect.

212. LINA failed to properly consider the opinions of Ms. Spaulding's treating and examining physicians.

213. LINA failed to explain why it credited the physician reviewers over Ms. Spaulding's treating physicians.

214. Upon information and belief, LINA used in-house reviewers in evaluating Ms. Spaulding's claim, because it knew that the in-house reviewers' recommendations would be unfavorable for the approval of Ms. Spaulding's LTD benefits.

215. The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

216. The peer reviewers were not given the Plan or other important records for reaching its decision that Ms. Spaulding could perform work.

217. LINA engaged in other procedural irregularities, which it did to serve its own financial best interests.

218. On information and belief, LINA engaged in claim discussions to decide the

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

-24-

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermined path of terminating benefits.

219.  For its own financial gain, LINA intentionally sought and gathered evidence against Ms. Spaulding's LTD claim to the exclusion of evidence supporting her LTD claim.

220.  LINA failed to conduct a "meaningful dialogue" regarding Ms. Spaulding's LTD claim.

221.  LINA failed to conduct a full and fair review.

222.  Under the *de novo* standard of review, to be entitled to benefits Ms. Spaulding need only prove by a preponderance of the evidence that she is disabled.

223.  Even under the abuse of discretion standard of review, LINA abused its discretion, because its decision to deny Ms. Spaulding's LTD benefits was arbitrary and capricious and was caused or influenced by LINA's, its reviewing physicians', and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

224.  Ms. Spaulding is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of LINA's reviewing physicians', its employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision to deny Ms. Spaulding's LTD claim.

225.  Under the *de novo* standard of review, Ms. Spaulding is entitled to discovery regarding, among other things, the credibility of LINA's medical reviews and LINA's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the *de novo* standard of review, new evidence may be admitted regarding, among other things: "the credibility of medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

226.  Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B),

and to applicable federal law, Ms. Spaulding is entitled to recover all benefits due under the terms of the Plan, and to enforce her rights under the Plan.

227.  Ms. Spaulding is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the denial of her LTD benefits. She is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully denied.

228.  Pursuant to 29 U.S.C. § 1132(g), Ms. Spaulding is entitled to recover her attorneys' fees and costs incurred herein.

229.  Ms. Spaulding is entitled to prejudgment interest on the benefits to which she is entitled and on her damages at the highest legal rate until paid.

**COUNT II**
**(Breach of Fiduciary Duty)**
**(LINA and Mr. Gregg)**

230.  All other paragraphs are incorporated by reference.

231.  Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

232.  LINA is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Spaulding.

233.  Mr. Gregg is a fiduciary and owes fiduciary duties to Plan participants, including Ms. Spaulding.

234.  Under 29 U.S.C. § 1104(a), LINA and Mr. Gregg are required to discharge their duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

235.  Under ERISA, which is founded in trust principles, LINA and Mr. Gregg are required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

236.  In multiple ways throughout the administration of Ms. Spaulding's claim, LINA and Mr. Gregg breached their fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

237. Mr. Gregg breached his fiduciary duty under ERISA by knowingly choosing a conflicted fiduciary to administer both STD and LTD claims knowing LINA had an incentive to deny STD benefits to avoid liability for LTD benefits, and failing to monitor LINA's claim handling, failing to insure LINA performed its duties under the Plan, failing to insure that LINA's conflict of interest did not infect the claim process, and failing to take prudent and appropriate corrective actions.

238. On information and belief, LINA instructs or incentivizes certain employee(s) to deny fully insured LTD claims and appeals based on bias or its financial interests.

239. Ms. Spaulding is informed and believes that LINA's employees are trained in administering claims in the best interests of LINA, not Plan participants.

240. LINA demonstrated bias and malice against Ms. Spaulding through its employees. Instead of fully and fairly reviewing the medical evidence, LINA unreasonably denied Ms. Spaulding's LTD claim based on unreliable evidence.

241. LINA breached its fiduciary duty by targeting claims for denial, failing to make a decision on the LTD Appeal, acting with malice and in bad faith against Ms. Spaulding, and imprudently handling her LTD claim causing Ms. Spaulding serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

242. To the extent that LINA's LTD benefits denial caused Ms. Spaulding harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

243. ERISA "does not elsewhere adequately remedy" the injuries caused to Ms. Spaulding by LINA's and Mr. Gregg's breach of fiduciary duty violations.

244. Based on the facts of this case, Ms. Spaulding has "other equitable relief" available to her in several forms, including but not limited to surcharge, because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Ms. Spaulding whole for her losses from LINA's and Mr. Gregg's breaching conduct.

245. The Court has broad discretion to fashion appropriate relief to make Ms. Spaulding whole and should mold the relief necessary to protect the rights of the

participants.

246. A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary. Surcharge is defined as "[t]he amount with which a court may charge a fiduciary who has breached his trust through intentional or negligent conduct. The imposition of personal liability on a fiduciary for such conduct." Blacks' Law Dictionary 1005 (6th ed. 1991).

247. As a direct and proximate result of the breaches of fiduciary duty, Ms. Spaulding suffered actual, significant financial harm and has incurred financial expense.

248. As a result of LINA's and Mr. Gregg's breaches of fiduciary duty, Ms. Spaulding became homeless, had to rehome her pets, drain savings, and accrue substantial debt. Ms. Spaulding was a loyal employee of Honeywell for nearly two decades. To lose her health and livelihood was devastating. She bargained for the income protection provided by Honeywell through LINA, and as a direct result of LINA's misconduct and wrongful LTD denial, she has lost almost everything.

249. Ms. Spaulding is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

250. She is entitled to enjoin any act or practice by LINA and Mr. Gregg that violates ERISA or the Plan, or seek other appropriate equitable relief that is traditionally available in equity.

251. A plaintiff may "enjoin future improper claims handling activities that may lead to wrongful denials in order to prevent future delays in payments." *Mullin v. Scottsdale Healthcare Corp. Long Term Disability Plan,* No. CV-15-01547-PHX-DLR, 2016 U.S. Dist. LEXIS 2927 at *11-12; *Brady v. United of Omaha Life Ins.,* Co., 902 F. Supp. 2d 1274, 1281 (N.D. Cal. 2012). Any injunctive relief must be intended for his "sole benefit" to bar certain conduct "in the event the parties have future interactions related to Plaintiff's LTD benefits after the lawsuit is resolved." *McGlasson v. Long Term Disability Coverage*, 161 F. Supp. 3d 836, 840 (D.

OBER & PEKAS, PLLC
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1   Ariz. 2016).

2   252.  Injunctive relief broadly worded requiring a defendant to "obey the law in the

3   future" is prohibited, **but injunctive relief "describ[ing] in reasonable detail . . . the**

4   **acts restrained or required" is entirely proper.** *Brady* at 1284 (citations omitted)

5   (emphasis added); *see also* Fed. R. Civ. P. 65(d)(1)(C).

6   253.  LINA's and Mr. Gregg's imprudent conduct demands injunctive relief as permitted

7   under ERISA, because the relief under (a)(1)(B) is inadequate to prevent future harm.

8   254.  In particular, the Court can enjoin a plan administrator from using a conflicted

9   fiduciary to administer both STD and LTD claims, unless the plan administrator imposes

10  sufficient procedural safeguards to insure the conflict does not affect the process.

11  255.  LINA engaged in several procedural violations in an attempt to circumvent its

12  obligations under ERISA, which is conduct the Court can enjoin.

13  256.  The Court can order LINA to administer Ms. Spaulding's LTD claim according to

14  the Plan terms and prohibit LINA from engrafting additional terms.

15  257.  The Court can order LINA to adopt the ERISA regulation's definition of

16  "relevant" document and order LINA to provide all relevant documents to Ms. Spaulding.

17  258.  The Court can order LINA to make a timely decision on Ms. Spaulding's appeal in

18  the future.

19  259.  The Court can enjoin LINA from imposing unreasonable time limits to respond to

20  demands for production of necessary evidence and enjoin LINA from making a claim or

21  appeal decision prior to the expiration of the reasonable time limit.

22  260.  The Court can enjoin LINA from making claim or appeal decisions without

23  considering Ms. Spaulding's co-morbid conditions, side effects of her medications, and all

24  available medical evidence.

25  261.  The Court can order LINA, if it is going to reject the opinions of Ms. Spaulding's

26  treating physicians, to provide a coherent explanation for doing so.

27  262.  Ms. Spaulding is informed and believes that LINA has bias against her as a result

28  of the litigation that has ensued over her STD benefits. Ms. Spaulding seeks to enjoin LINA

**OBER & PEKAS, PLLC**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

1  from allowing any LINA employees or vendors who worked on the STD claim from

2  evaluating and administering her LTD claim moving forward.

3  263. LINA was unjustly enriched as a result of its breach of fiduciary duty violations,

4  because it wrongfully withheld Ms. Spaulding's LTD benefits for its own profit.

5  264. Ms. Spaulding is entitled to prejudgment interest on the benefits to which she is

6  entitled and on her damages at the highest legal rate until paid in full.

7  265. Pursuant to 29 U.S.C. § 1132(g), Ms. Spaulding is entitled to recover her attorneys'

8  fees and costs incurred herein.

9  **WHEREFORE**, on all claims, Ms. Spaulding prays for entry of judgment against

10  Defendants as set forth in this Complaint, which includes:

11  A.  All past LTD benefits under the terms of the Plan;

12  B.  Clarifying and determining Ms. Spaulding's rights to future benefits under the

13  terms of the Plan;

14  C.  For any other benefits Ms. Spaulding may be entitled to receive under the

15  Plan due to her disability;

16  D.  All other equitable relief that is proper as a result of LINA's and Mr. Gregg's

17  breaches of fiduciary duties;

18  E.  An award of Ms. Spaulding's attorneys' fees and costs incurred herein;

19  F.  An award of prejudgment interest on benefits and damages at the highest

20  legal rate until paid in full; and

21  G.  For such and further relief as the Court deems just, equitable, and reasonable.

22

23  Dated this 3rd day of October, 2017.

24  OBER & PEKAS, PLLC

25  By: _s/ Kevin Koelbel_
     Kevin Koelbel
26     Erin Rose Ronstadt
     Attorneys for Plaintiff
27

28